

RYAN RAPP
UNDERWOOD
& PACHECO PLC

3200 N. Central Avenue, Suite 2250
Phoenix, Arizona 85012
(602) 280-1000 (602) 265-1495 Fax
Christopher T. Rapp, AZ State Bar No. 013374
Andrew C. Pacheco, AZ State Bar No. 018105
Email: ctrapp@rrulaw.com • apacheco@rrulaw.com
*Attorneys for Plaintiff Mark Alan Greenburg*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **MARK ALAN GREENBURG**, a married man, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| **AMANDA WRAY AND DANIEL WRAY**, a married couple, | (Defamation, False Light, Computer Fraud and Abuse, Intrusion Upon Seclusion, Public Disclosure of Private Facts) |
| Defendants. | *Assigned to the Hon.* |

The Plaintiff herein, Mark Alan Greenburg (the "Plaintiff"), by and through his attorneys undersigned, for his complaint and causes of action against Defendants Amanda Wray and Daniel Wray (individually referred to by their own names, collectively referred to as "Defendants"), allege as follows:

## GENERAL ALLEGATIONS

1.      This action arises under 18 U.S.C. §§ 1030(a)(2) and 1030(g), as well as Arizona state law for claims for defamation, false light, intrusion upon seclusion, public disclosure of private facts, trespass to chattels, and conversion.

2.      Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1331.

1    3.    Venue in this court is proper pursuant to 28 U.S.C. § 1391.

2    4.    Plaintiff is a married person who currently resides at 8703 E. Via De Viva,

3    Scottsdale, AZ 85258.

4    5.    Defendants Amanda Wray and Daniel Wray  are a married couple who

5    currently reside at 14256 N. Territory Trail, Fountain Hills, Arizona 85268, and all of the

6    acts alleged to have been done by Amanda were committed in Arizona and within the

7    jurisdiction of the court for the benefit of their community.

8    6.    This action is timely initiated pursuant to 18 U.S.C. § 1030(g) and A.R.S. §§

9    12-541 to 12-542.

10                        **BACKGROUND**

11                 **Plaintiff Mark Alan Greenburg**

12    7.    Plaintiff is a resident of Scottsdale, Arizona.

13    8.    Plaintiff works in Scottsdale and runs his businesses in Scottsdale.

14    9.    Plaintiff proudly pays property taxes in Scottsdale, some of which are

15    distributed to the Scottsdale Unified No. 48 School District (the "District").

16    10.    Plaintiff is interested in the academic, social, and extra-curricular success of

17    the District.

18    11.    Plaintiff's children received an excellent education while attending the

19    District's schools.

20    12.    Additionally, having a strong public school system benefits his home property

21    value.

22

2

13.     Plaintiff also cares deeply about Scottsdale's open embrace of diversity and support for its minority populations, including without limitation religious, LGBTQ+, and racial and ethnic minorities.

14.     Plaintiff's son is a current board member and former board president of the Scottsdale Unified No. 48 Governing Board, the elected governing body that manages the District.

15.     Plaintiff is a private person.

16.     Plaintiff has no control over the District's affairs.

**Defendant Amanda Wray**

17.     Defendant Amanda Wray is a political operative related to matters within the District.

18.     Amanda is also the leader and administrator of a private Facebook group called "SUSD-CAN" ("SUSD-CAN"), which is dedicated to propagating anti-mask policies, anti-vaccine policies, anti-LGBTQ policies, and anti-Critical Race Theory policies within the Scottsdale Unified School District.

19.     Upon information and belief, SUSD-CAN has nearly 2,000 members, including elected officials, candidates for public office, officials within political parties, and members who are convicted felons.

20.     Defendant Daniel Wray is a member of SUSD-CAN.

21.     Daniel has commented on SUSD-CAN Facebook posts, including "the 'infinite game' is where it's at, my love. We were never given a shot in this battle. We will find justice on a more even battleground."

3

22.     Daniel ratified Amanda's activities, for the benefit of their community.

23.     Upon information and belief, Amanda uses SUSD-CAN to accomplish both her desired political goals and to find new clients for her business as a behavioral investment advisor.

24.     Amanda has gone so far as to steal Plaintiff's private information and documents.

25.     Amanda has also doxed Plaintiff by publishing and discussing Plaintiff's home address, license plate, and Paycheck Protection Program loan information to SUSD-CAN's Facebook page.

26.     Prior to January 22, 2021, Plaintiff had never communicated with Amanda.

27.     Plaintiff has never met Amanda.

28.     Plaintiff has never publicly commented about Amanda.

29.     Upon information and belief, Amanda undertook actions against Plaintiff in order to influence his son.

30.     Most notably, Amanda has engaged in a year's long campaign defaming, placing in a false light, and publishing private information about Plaintiff to ferment SUSD-CAN members' ever-increasing hatred of Plaintiff's son.

31.     Amanda's primary target of political and discriminatory attack has been, and continues to be, Plaintiff's son.

32.     Amanda's hatred of Plaintiff's son is extensive.

4

33.     Amanda's stated mission is to not "rest until Jann-Michael Greenburg loses the election in 2022" and ensure he has no "political career."

34.     Amanda believes Plaintiff's son is a "hateful," "evil" person who has "infiltrated" the District.

35.     Upon information and belief, Amanda has made hundreds of posts and comments criticizing Plaintiff's son in 2020 and 2021.

36.     Amanda's actions extend well beyond legitimate political disagreements.

37.     Amanda began attacking Plaintiff's son's private employment and family.

38.     Upon information and belief, Amanda supported her actions citing "Rule 12" from Saul Alinksy's book, "Rules for Radicals": "Pick the target, freeze it, personalize and polarize it, cut off the support network and isolate the target from sympathy. Go after people, not institutions. People hurt faster than institutions. This is cruel but very effective. Direct, personalized criticism and ridicule works."

## SPECIFIC ALLEGATIONS

### Defamation and False Light

39.     Amanda has routinely defamed and placed Plaintiff in a false light since at least January 22, 2021.

40.     One example, in a Facebook "post" published to on SUSD-CAN's Facebook page on January 22, 2021, Amanda Wray falsely accused Plaintiff of attending a District governing board meeting on January 19, 2021 for the purpose of intimidating and harming her:

Tuesday night I attended the SUSD Governing Board meeting in person . . . Shortly after the meeting began, Mark Alan Greenburg [Plaintiff], our Governing Board President Jann-Michael Greenburg's dad, walked in and sat in a row of seats behind me and to my left. After another couple of minutes, he moved to sit directly behind me. *I closed my laptop at that time to avoid him looking over my shoulder at my screen. Plenty of other chairs in the room, but he chose to sit as close as possible to our group of parents. I left at the break with another friend so we didn't walk to our cars alone.*

(Emphasis added.)

41.     Amanda has republished these false statements on numerous occasions, including adding additional false details:

a.     In a January 25, 2021 letter to the District, Amanda wrote that

[a]t the last board meeting . . . Mark Greenburg walked into the room *and looked at me in way [sic] that made me uncomfortable*. I knew immediately who he was. After sitting down behind me, slightly to my left, he got up and moved to the seat directly behind me, slightly to my left. *Several of us* felt uncomfortable *as he lurked behind us* as there were plenty of other open and available seats around the room. *This clearly felt like an intimidation technique intended to scare us*. After public comment discussion . . . I began to pack up my things to get back home to my family. Mark left the room in advance. *Because we had felt so uncomfortable, I decided not to leave* until on [sic] of my friends could leave with me *as I suspected that Mark was waiting in the lobby. He finally returned after a long absence (longer than a bio break)* and took his seat.

(Emphasis added.)

b.     On May 19, 2021, Amanda wrote a comment on a post that she published to SUSD-CAN's Facebook page, falsely confirming that Plaintiff "stalked" her at the January 19, 2021 meeting.

6

1    c.    During a November 11, 2021 interview on the Garrett Lewis radio

2    show, Amanda stated "He [Plaintiff] has [intimidated me]. He intimidated me back in

3    January at a board meeting . . . ."

4    42.    Amanda has also repeatedly falsely accused Plaintiff of harassment by sending

5    her unwanted, unsolicited private Facebook messages, including without limitation:

6    a.    In a January 22, 2021 Facebook post, Amanda falsely accused Plaintiff

7    of sending her an unsolicited private Facebook message for "challenging" Plaintiff's son.

8    b.    In a January 25, 2021 letter to the District, Amanda Wray wrote that

9    During the Q&A . . . I paraphrased in the chat [Plaintiff's son's]
comment that I felt it was inappropriate as [sic] non-partisan school

10   board member [sic] "Some of the people that I voted for in this
election lost, and that is a shame." That was the extent of my

11   comment . . . Mark Greenburg [Plaintiff] saw my name and my
comment, I'm sure it made him angry and got under his skin . . .

12   Friday, at 12 a.m., several hours after my remark during the town
hall meeting, I received a [sic] FB Instant Message from [Plaintiff] .

13   . . *This isn't the first time I've gotten messages from Mark
Greenburg [Plaintiff] in the middle of the night. He often deletes*

14   *them by the next morning, probably not realizing that I've seen them.*
*We have multiple instances from many parents and we are compiling*

15   *evidence into a central file for use in a criminal case if necessary.*

16   (Emphasis added.)

17   c.    On May 21, 2021, Amanda wrote a comment on a Facebook post that

18   "the last time [she] publicly criticized Jan [sic] for making a political rant during a non-

19   partisan board meeting (he blamed SUSD parents for the riot at the Capital [sic]) I was

20   personally harassed. [Shrug Emoji] Weird how men don't get the same response from

21   Greenburgs [Plaintiff]."

22

1          d.      On or around November 27, 2021, Amanda was invited to speak on the

2  "American Ammo Podcast" and stated that

3          *[Plaintiff] had harassed me through Facebook* and I had reported to
           the superintendent I did not feel safe going to school board meetings

4          and asked for his help. And in turn, that email was turned over to . . .
           [Plaintiff] where I was asking for help. *They, they literally [gave] my*

5          *stalkers* my phone number and email address.

6          (Emphasis added.)

7       43.      In many instances, Amanda even included a photograph of an *edited* exchange

8  of messages between her and Plaintiff to make it falsely appear as though Plaintiff did in fact

9  send Amanda an unsolicited, unwanted Facebook message.

10      44.      In a January 25, 2021 letter to the District, Amanda has also falsely accused

11  Plaintiff of threatening a third party with a weapon and implies he will harm her, writing that

12  "I have heard from a reliable source that Mark Greenburg [Plaintiff] threatened another

13  private citizen by displaying a weapon while out placing campaign signs for Eric Kurland."

14      45.      Amanda admits to republishing this false statement to others, writing that she

15  has ". . . made this information public to other members our [sic] our group [SUSD-CAN]

16  and there is increased awareness of Mark Greenburg's [Plaintiff's] behavior."

17      46.      Amanda further falsely implies Plaintiff will harm her physical safety at school

18  board meetings, writing that she is ". . . putting [herself] at great risk by making this public"

19  and ". . . will ask the police officers present [at board meetings] to make note of [Plaintiff's]

20  presence . . . ."

21

22

8

47.   In a May 19, 2021 Facebook post to SUSD-CAN, Amanda also falsely accused Plaintiff of harassment for creating a political "meme" regarding a matter of public concern, an exercise of his First Amendment rights, writing that:

> Okay parents, this just got personal! Jann-Michael's daddy, Mark Alan Greenburg [Plaintiff], just personally attacked one of our own by taking a comment way out of context. *Please go to this public post and report Mark's [Plaintiff's] comment as harassment . . . Edited: the post was removed so I've taken the photo down out of respect for the person being harassed.*

(Emphasis added.)

48.   In yet another incident, during an August 24, 2021 recall petition signature drive improperly conducted *on public school grounds* organized by Amanda, Amanda falsely accused Plaintiff of threatening her, telling police officers "to be on the lookout for Jann-Michael Greenburg's father, Mark [Plaintiff]. He has threatened me in the past and I don't feel safe with him near me."

49.   Amanda spoke loudly enough for third parties nearby to hear her.

50.   At that same August 24, 2021 recall signature petition drive, Amanda also took photographs of Plaintiff, wrote down his license plate number and ran it (without a legitimate purpose), and published both the photographs and Plaintiff's license plate number, in full, to SUSD-CAN.

51.   Beginning on or around August 25, 2021, Amanda also falsely accused Plaintiff of unlawfully taking photographs of minors, stalking, and threatening her physical safety simply because Plaintiff attended the recall petition signature drive, including without limitation:

9

a.    "[Plaintiff] sat outside in 105 [degrees] to take photographs of women *and children* while they signed petitions."

b.    "I've reported [sic] we need others to do as well. No one signed a photo release so what is he doing *with photos of children*."

c.    In an August 29, 2021 Twitter post, Amanda wrote "It's totally normal behavior for a @ScottsdaleUSD school board member's daddy [Plaintiff] to be *taking pics of moms and their kids signing recall petitions*, right? I'm sure it's just for the family scrapbook." Emphasis added.

d.    "So we deal with JMGs [sic] dad [Plaintiff] stalking while the board is barricaded inside because of 'safety concerns' [sic] Got it."

e.    On November 11, 2021, Amanda gave an interview on "The Morning Ritual with Garrett Lewis," in which she stated:

> And that board meeting where he showed up, I was there at four o'clock. He pulled right in front of me. I know exactly what, who he was. I only have one stalker. It was clearly him . . . And here we are, I am sat outside like a sitting duck. I had gone to the police officers that were on site . . . and I said, "I am afraid of this man. Like, he is taking photos of us." It is 105 degrees, he is in full motorcycle gear, never took his helmet off . . . The police officers looked at me and said, "Well, he has a right to be here."

f.    On or around November 17, 2021, Amanda gave an interview on "The Dana Show with Dana Loesch," in which she stated "there's bodycam footage of Mark Greenburg [Plaintiff] . . . stalking me and talking about concealing his identity and intimidating me."

g.      Amanda also again falsely accuses Plaintiff of intentionally intimidating her, stating that Plaintiff "showed up on a motorcycle and parked directly in front of me and was there to intimidate me."

h.      On or around November 27, 2021, Amanda was invited to speak on the "American Ammo Podcast" and stated that Plaintiff "showed up on a motorcycle and parked directly in front of me and was there to intimidate me."

52.    All of these statements and accusations are false and created a false impression about Plaintiff.

53.    Regarding Amanda's statements that Plaintiff attended the January 19, 2021 board meeting to intimidate, harass, or harm her, Amanda knew those statements were false or acted in reckless disregard of the truth for following reasons:

a.      Plaintiff has regularly attended District board meetings since 2017, either in person or virtually, because his tax dollars are invested there and he is interested in ensuring the best public education possible for students in Scottsdale.

b.      Plaintiff had no knowledge Amanda was going to be present at the January 19, 2021, board meeting, and did not realize she was present when he arrived.

c.      Plaintiff had never even seen Amanda in person.

d.      Plaintiff did not "look" at Amanda at all, and therefore could not have done so for the purposes of intimidating or harassing her and making her feel "uncomfortable" when he entered the board room.

e.      The seats face away from the board room's entrance/exit and towards the board members.

11

1             f.       Plaintiff sat in the left back row closest to the board room's

2  entrance/exit.

3             g.       Plaintiff entered the board meeting after it had started.

4             h.       Amanda's back would have been to Plaintiff when he entered the board

5  room, not to the entrance/exit if Plaintiff truly was sitting behind her.

6             i.        The seats were spread out six feet or greater apart as part of the

7  District's COVID mitigation plan.

8             j.        Plaintiff did not look over Amanda's shoulder.

9             k.       Plaintiff was not "lurking" behind Amanda or anyone else.

10             l.        Plaintiff sat in the designated seating area in plain view of every

11  attendee.

12             m.      As a private citizen, Plaintiff prefers sitting in seats that are not on

13  camera when practical (District board meetings are live streamed to the Internet).

14             n.       Video footage of the January 19, 2021, board meeting is available at

15  https://www.youtube.com/watch?v=kNg45XygH_w.

16             o.       The footage shows that Plaintiff entered the Board meeting between the

17  22-minute mark and the 28:43-minute mark.

18             p.       At the 28:43-minute mark, the video camera angle switches to

19  displaying some of the attendees.

20             q.       Plaintiff can be partially seen sitting in the back row seat on the top left

21  corner of the video.

22

1    r.    When Plaintiff realized he was in view of the camera (at the 30:20-minute mark), he moved one seat to his right.

3    s.    Plaintiff has never threatened Amanda.

4    t.    Plaintiff never followed Amanda to the parking lot.

5    u.    Plaintiff never waited for Amanda in the parking lot.

6    v.    Plaintiff never followed Amanda to the lobby.

7    w.    Plaintiff never waited for Amanda in the lobby.

8    54.    Regarding Amanda's statements that Plaintiff sent Amanda unwanted, unsolicited Facebook messages, Amanda knew those statements were false or acted in reckless disregard of the truth for following reasons:

11    a.    Amanda initiated a message to Plaintiff to inform him he was kicked out of the SUSD-CAN Group, writing "Goodbye."

13    b.    Plaintiff only messaged Amanda after Amanda messaged him.

14    c.    Amanda edited the conversation by deleting her original message to Plaintiff, thereby removing the fact that she engaged Plaintiff in conversation first.

16    d.    This made it falsely appear as though Plaintiff did send Amanda an unsolicited, unwanted Facebook message.

18    e.    Amanda knew that Plaintiff was responding to her unsolicited private Facebook message to Plaintiff.

20    f.    Amanda knew that Plaintiff did not send an unsolicited private Facebook message to her for the purposes of intimidating her for "challenging" Plaintiff's son.

13

g.      Amanda initiated conversation with Plaintiff regarding Plaintiff's pseudonym account and removal from SUSD-CAN – *not* about her challenging Plaintiff's son.

h.      While Plaintiff's response may have been childish, Plaintiff was also upset over the dozens of public, unwarranted personal attacks Amanda had made about Plaintiff starting from at least January 7, 2021.

i.      Plaintiff has never sent Amanda *any* unsolicited private Facebook messages at any time, including "in the middle of the night."

j.      Prior to Plaintiff's January 22, 2021, response to Amanda, Plaintiff had never sent Amanda *any* private Facebook messages at all.

k.      Plaintiff has only had two conversations with Amanda via private Facebook message.

l.      In both cases, Amanda initiated the conversation.

m.      Amanda knew Plaintiff does not send her "messages . . . in the middle of the night."

55.     Regarding Amanda's false statements that Plaintiff has threatened her, Amanda knew those statements were false or acted in reckless disregard of the truth because Plaintiff has never threatened Amanda.

56.     Regarding Amanda's false statements that Plaintiff harassed another person, Amanda knew those statements were false or acted in reckless disregard of the truth because Plaintiff has never harassed anyone and posting a political "meme" is not harassment.

14

57.    Regarding Amanda's false statements that Plaintiff photographed minors unlawfully, stalked her, and intimidated her at the August 24, 2021 recall petition signature drive, Amanda knew those statements were false or acted in reckless disregard of the truth for following reasons:

a.    On an August 24, 2021 Facebook comment, Amanda admitted that Plaintiff was not doing anything illegal, writing "*The [Scottsdale Police Department] told us it was okay* [Shrug Emoji] we were so bothered by it that Sarah Kraft Dorn asked." (Emphasis added.)

b.    Nonparty Sarah Kraft Dorn also responded, writing that she "talked to two officers on site about the issue . . . *I was told this person has as much right to be there as I did. They declined to do anything about it*." (Emphasis added.)

c.    Plaintiff attended the recall effort event in the hopes of photographing SUSD-CAN members violating Arizona election laws while collecting recall petition signatures - evidence that could form the basis of challenging any unlawfully gathered signatures.

d.    Amanda and SUSD-CAN's member publicly posted that they would be collecting signatures at 4:00PM at Coronado High School.

e.    The flyer indicated the petition signature drive would occur on school property, in possible violation of A.R.S. §§ 15-511 or 13-2911.

f.    Further, some of SUSD-CAN's members who indicated that they would be there to help collect signatures are convicted felons whose civil rights have not been restored.

15

g.      Plaintiff never took any photographs of children.

h.      Children are not qualified voters and cannot sign recall petitions.

i.      Amanda also knew no "photo release" is required to take photos of a political event in a public space.

j.      No person has an expectation of privacy in a public place.

k.      It is perfectly "normal behavior" for individuals to collect evidence to help challenge recall petition signatures.

l.      Upon information and belief, Amanda and SUSD-CAN members took their own photos of participants collecting signatures and posted them, publicly, to Facebook.

m.      Plaintiff did not stalk Amanda or anyone else.

n.      Plaintiff never discussed intimidating Amanda.

o.      The bodycam footage, a private record which Amanda reviewed, stole, and publicly disclosed, does not contain one statement from Plaintiff regarding plans to intimidate her.

p.      Plaintiff does discuss having to take measures to conceal his identity, given Amanda's and SUSD-CAN's history of defamatory attacks concerning Plaintiff.

q.      Plaintiff also discusses – in his own home – his intent to sue Amanda for her multitude of defamatory statements about Plaintiff.

r.      Given Amanda's and SUSD-CAN's defamation and vilification of Plaintiff for attending the signature petition recall event, Plaintiff's concerns were well-founded.

16

58.     Further, threatening, intimidating, or harassing someone by sending repeated anonymous, unwanted, or unsolicited electronic communications is a Class 1 misdemeanor under A.R.S. § 13-2916.

59.     Further, anonymously contacting or communicating with another person by electronic or written means with the intent of harassing them is a Class 1 misdemeanor under A.R.S. § 13-2921.

60.     Further, the unjustified displaying of a deadly weapon is a Class 6 felony under A.R.S. § 13-2904 – a potentially imprisonable offence.

61.     Further, possessing a deadly weapon on school grounds is a Class 1 misdemeanor or Class 6 felony under A.R.S. §§ 13-3102(A)(12) and 13-3102(M) – a potentially imprisonable offence.

62.     Further, stalking is a Class 5 or Class 3 felony under A.R.S. § 13-2923 – a potentially imprisonable offense.

63.     Upon information and belief, Amanda knew her statements were false.

64.     Upon information and belief, Amanda held significant animus towards Plaintiff.

65.     Upon information and belief, Amanda intended to inflict harm on Plaintiff by making false statements about Plaintiff.

66.     Upon information and belief, Amanda deliberately omitted facts, added false details, and avoided the truth to distort the truth.

67.     Upon information and belief, Amanda knew or strongly suspected her statements about Plaintiff would create a substantially false impression about Plaintiff.

17

68.     Upon information and belief, Amanda's statements were completely created from her own imagination and not grounded in reality.

69.     Upon information and belief, Amanda's false statements and implications worked exactly as she intended: Plaintiff was roundly condemned by SUSD-CAN's members and was further defamed by them.

70.     For example, Amanda's January 22, 2021 Facebook post garnered at least 73 "reactions" (e.g., "thumbs up," "anger," and "shock") and 170 "comments" further vilifying and defaming Plaintiff, including additional comments made by Amanda.

71.     Amanda's May 19, 2021 Facebook post falsely accusing Plaintiff of harassment garnered at least eight reactions and 18 comments further vilifying and defaming Plaintiff.

72.     Amanda's August 29, 2021 Twitter post garnered at least 12 comments, 80 "re-tweets" (or "shares"), and 100 "likes."

73.     Amanda's various Facebook posts garnered at least 53 reactions and 80 comments.

**Computer Fraud and Abuse and Intrusion Upon Seclusion**

74.     In response to SUSD-CAN's activities, Plaintiff began privately creating and collecting records on key figures within SUSD-CAN's organization, including Amanda.

75.     Plaintiff collected these records primarily for anticipated litigation against those individuals and for the protection of his family's safety.

76.     Records Plaintiff collected included SUSD-CAN's social media posts and activity, social media accounts, and background checks.

77.     Records also included photographs and video footage Plaintiff took and materials in preparation for litigation.

78.     Records also included Plaintiff's discussions with third parties.

79.     Records also included Plaintiff's political commentary and political "memes," including commentary and memes that have never been publicly published.

80.     Records also included Plaintiff's private comments and personal thoughts about third parties.

81.     Records also included miscellaneous business records.

82.     Plaintiff stored all such records on his server housed somewhere in the United States, known as a "Google Drive."

83.     Plaintiff operates his server as a virtual tenant, with Google managing the server's physical location.

84.     Plaintiff accesses his server using his computer, which is connected to the Internet.

85.     Plaintiff can access his server from anywhere in the world.

86.     When a person accesses Plaintiff's Google Drive, that person necessarily accesses Plaintiff's server.

87.     In general, the records on the server were kept private, requiring a password to access.

88.     Plaintiff only shared access to the server with three other individuals, including Plaintiff's son.

89.     Those three individuals accessed the Google Drive by logging into their password protected Google accounts and accessing the server's contents.

90.     Unknown to Plaintiff and the other three individuals, a setting on the Google Drive could enable unauthorized third parties to access the server without a password.

91.     The Google Drive was not searchable using a Google search or another Internet search, meaning its location could not be found by anyone.

92.     However, unauthorized third parties could access the server if, and only if, they obtained the Google Drive's *exact* Uniform Resource Locator ("URL").

93.     Upon information and belief, the URL is not "guessable," and is commonly referred to as a form of "security through obscurity" data protection.

94.     In effect, the URL acts as a unique code to access Plaintiff's server, replacing the typically required password and username.

95.     In or around August, 2021, Plaintiff's son was accused of defamation.

96.     In response to the accuser, Plaintiff's son sent a number of emails containing various photographs of public comments stored on the server.

97.     Unknown to Plaintiff's son, the URL to the Google Drive was visible in one of the photographs.

98.     The URL was not hyperlinked, meaning one could not "click" the link and access the Google Drive – one would have to manually retype all 68 characters.

99.     The situation was the equivalent of Plaintiff's son accidentally disclosing his username and password.

100.     Amanda obtained the photograph containing the URL.

20

101.   At no time did Plaintiff's son, Plaintiff, or the other two individuals with whom the Google Drive had been shared, provide Amanda (or any other third parties) permission, sanction, or warrant to access the server.

102.   Upon information and belief, Amanda knew the URL had been shared by mistake.

103.   Upon information and belief, Amanda believed the URL to be password protected since it contained Plaintiff's private records.

104.   Upon information and belief, Amanda did not attempt to access the Google Drive because she knew it contained private documents not meant for public consumption.

105.   Over time, because the recall effort against Plaintiff's son was failing, upon information and belief Amanda attempted to access the Google Drive without authorization a month later.

106.   However, Amanda did not know how to access Plaintiff's server and Google Drive, and requested a third party to create a way for Amanda to access the server.

107.   Upon information and belief, that third party used the URL to create a hyperlink, enabling Amanda Wray to intentionally access Plaintiff's Google Drive without authorization by clicking on the hyperlink.

108.   Upon information and belief, Amanda knew she was not authorized to access Plaintiff's private records.

109.   Upon information and belief, Amanda spent weeks accessing and reviewing Plaintiff's private records.

21

110.   Upon information and belief, Amanda downloaded the entire contents of the server, creating a copy of the Google Drive.

111.   Upon information and belief, Amanda deleted some of Plaintiff's files stored on the server.

112.   Upon information and belief, Amanda added files to Plaintiff's server.

113.   Upon information and belief, Amanda reorganized files on Plaintiff's server.

114.   Upon information and belief, Amanda renamed files on Plaintiff's server.

115.   Upon information and belief, Amanda's access, review, alteration, and copying of Plaintiff's private records by entering his server without authorization was motivated by her extreme animus towards Plaintiff and Plaintiff's son.

116.   Upon information and belief, Amanda's objective was to terrorize Plaintiff and bolster support for her recall efforts against Plaintiff's son.

117.   Plaintiff felt extremely angry and violated by Amanda's interference and invasion of his private records.

118.   In response, Plaintiff hired forensic IT consultants to analyze the extent of the data breach, what files were accessed, what files were copied, what files were deleted, and what files were added.

119.   As a result, Plaintiff has suffered loss aggregating at least $5,000 in value.

**Public Disclosure of Plaintiff's Private Records**

120.   Upon information and belief, Amanda provided her copy of Plaintiff's private records to an attorney.

121.   Upon information and belief, the attorney told Amanda that the contents of her copy or copies of Plaintiff's private records did not contain any unlawful materials.

122.   Upon information and belief, Amanda then provided her copy of Plaintiff's private records to various news organizations on or around November 2021.

123.   Upon information and belief, Amanda falsely characterized Plaintiff as having harassed, threatened, intimidated, and cyberstalked her.

124.   Upon information and belief, Amanda provided those false stories to increase media interest in Plaintiff's private records.

125.   Amanda's disclosure of Plaintiff's records to the public resulted in unwarranted national and international attacks on Plaintiff.

126.   Amanda has also publicly disclosed Plaintiff's private records on her public Twitter account.

127.   On November 12, 2021, Amanda publicly published a video from Plaintiff's private records where Plaintiff can be heard making private comments – in his home – about other private figures.

128.   Plaintiff felt extremely embarrassed, violated, and upset that his private records were publicly disclosed and misrepresented to cast Plaintiff in a clearly erroneous light.

129.   Upon information and belief, Amanda intended to inflict harm on Plaintiff and Plaintiff's son by disclosing Plaintiff's private records.

130.   Upon information and belief, Amanda's disclosure of Plaintiff's private records by accessing his server without authorization was motivated by her extreme animus towards Plaintiff and Plaintiff's son.

23

131.    Upon information and belief, Amanda's objective was to terrorize Plaintiff and force Plaintiff's son's resignation.

132.    Plaintiff's lawful collection of materials in preparation for litigation, protection of safety, opposition research, and exercise of his First Amendment rights to make political commentary is not of legitimate concern to the public.

133.    Likewise, Plaintiff's personal views of private figures are of no legitimate concern to the public.

**Defamation and False Light Following Public Disclosure of Private Records**

134.    Amanda has provided numerous interviews related to her public disclosure of Plaintiff's private records.

135.    During those interviews, Amanda has made multiple false statements related to Plaintiff and his private records.

136.    In a November 12, 2021 interview on "The Mike Broomhead Show," Amanda falsely accused Plaintiff collecting this information for the unlawful purposes off "harass[ment] and intimidat[ion]" stating that "[Plaintiff] had no legitimate purpose to collect this information."

137.    In an interview on "The Dana Show with Dana Loesch" on or around November 17, 2021, Amanda also falsely accuses Plaintiff of doxing her, stating Plaintiff "doxed us. And he, and, and for what reason?"

138.    These statements are false and created a false impression about Plaintiff.

139.   Regarding Amanda's statements that Plaintiff collected information for the purposes of harassment and intimidation, Amanda knew those statements were false or acted in reckless disregard of the truth because Plaintiff had never harassed or intimidated her.

140.   Further, Amanda knew that many of Plaintiff's records referenced possible litigation against her.

141.   Further, Amanda knew that none of the information Plaintiff collected had been collected unlawfully.

142.   Moreover, Amanda admitted to compiling information on Plaintiff as early as January 2021, but clearly did not view her own activities as unlawful.

143.   Collecting information for the purposes of anticipated litigation is not intimidation or harassment.

144.   Regarding Amanda's statements that Plaintiff doxed her, Amanda knew those statements were false or acted in reckless disregard of the truth because Plaintiff never publicly published any of Amanda's private information.

145.   To the contrary, Amanda stole Plaintiff's private records and published those records to the public herself.

146.   In effect, Amanda doxed herself, even going so far as to publicly publish her own home address.

147.   Further, Amanda's social media accounts are public, meaning any member of the public can access them.

148.   Upon information and belief, Amanda has uploaded hundreds of public photos of her home, her children, her children's school ID cards, her business, her family, and other personal photos.

149.   All such photos are publicly available online and are freely accessible to anyone with an Internet connection.

150.   Upon information and belief, Amanda knew her statement about Plaintiff doxing her was false.

151.   Upon information and belief, Amanda held significant animus towards Plaintiff.

152.   Upon information and belief, Amanda intended to inflict harm on Plaintiff by making a false statement about Plaintiff.

153.   Upon information and belief, Amanda deliberately omitted facts and avoided the truth to distort the truth.

154.   Upon information and belief, Amanda knew or strongly suspected her statement about Plaintiff would create a substantially false impression about Plaintiff.

155.   Further, doxing is a Class 1 misdemeanor under A.R.S. § 13-2916.

**COUNT I – DEFAMATION**

156.   Plaintiff, by this reference, incorporates the contents and allegations of the preceding paragraphs of this complaint as if fully set forth here.

157.   Defendants made, said, or wrote defamatory statements of fact about Plaintiff.

158.   Those statements were false.

159.   Defendants made, said, or wrote those statements to third persons, because Defendants either made those statements in the presence of third parties, published them on the Internet and were seen by multiple third parties, emailed them to third parties (e.g., the District's superintendent), or published them during radio, television, and podcast broadcasts.

160.   Defendants acted with actual malice, because at the time the statements were made, said, or written, Defendants knew that the statements were false or acted in reckless disregard of whether the statements were true or false.

161.   The statements impute to Plaintiff criminal offenses (e.g., harassment, stalking, cyberstalking, unjustified displaying a weapon, and doxing) punishable by imprisonment or are regarded by public opinion as involving moral turpitude.

162.   Defendants' statements have brought Plaintiff into disrepute, contempt, and ridicule, and have directly impeached Plaintiff's honesty, integrity, virtue, and good reputation.

163.   Defendants' statements caused Plaintiff to be damaged, the nature, magnitude, and extent of which will be adduced in discovery and at trial, but in an amount of at least $15,000,000.

164.   Defendants, and each of them, are additionally liable if any third person has repeated their false statements about Plaintiff.

**COUNT II – FALSE LIGHT**

165.   Plaintiff, by this reference, incorporates the contents and allegations of the preceding paragraphs of this complaint as if fully set forth here.

166.   Defendants made, said, or wrote public statements about Plaintiff.

167.   Defendants' statements or conduct created false impressions about Plaintiff.

168.   The impressions created about Plaintiff would be highly offensive to a reasonable person by imputing to Plaintiff criminal and other dishonest conduct (e.g., harassment, stalking, cyberstalking, unjustified displaying a weapon, and doxing).

169.   Defendants' statements have brought Plaintiff into disrepute, contempt, and ridicule, and have directly impeached Plaintiff's honesty, integrity, virtue, and good reputation.

170.   Defendants acted with actual malice, because at the time the statements were made, said, or written, Defendants knew their statements or conduct would create a false impression about Plaintiff or acted recklessly about whether their statements or conduct would create a false impression about Plaintiff.

171.   Defendants' statements caused Plaintiff to be damaged, the nature, magnitude, and extent of which will be adduced in discovery and at trial, but in an amount of at least $15,000,000.

**COUNT III – COMPUTER FRAUD AND ABUSE**

172.   Plaintiff, by this reference, incorporates the contents and allegations of the preceding paragraphs of this complaint as if fully set forth here.

173.   Plaintiff's Google Drive server is a protected computer because it is connected to the Internet and can be accessed from anywhere in the United States and world.

174.   Defendants intentionally accessed Plaintiff's Google Drive server without authorization or exceeding authorized access, because Plaintiff never gave Defendants

permission, sanction, warrant, or authority to access the Google Drive server and Defendants knew they had no such authority.

175.   Defendants obtained information from Plaintiff's Google Drive server, including without limitation by reviewing, copying, deleting, reorganizing, renaming, and adding information to Plaintiff's Google Drive server.

176.   Plaintiff suffered loss within a one-year period aggregating at least $5,000 in value because Plaintiff incurred expenses over $5,000 in responding to Defendants' actions, conducting a damage assessment, and restoring any data or information to its condition prior to Defendants' unauthorized access and activities.

177.   Defendants' actions caused Plaintiff to be damaged, the nature, magnitude, and extent of which will be adduced in discovery and at trial, but in an amount of at least $40,000.

**COUNT IV – INTRUSION UPON SECLUSION**

178.   Plaintiff, by this reference, incorporates the contents and allegations of the preceding paragraphs of this complaint as if fully set forth here.

179.   Defendants intentionally interfered with or invaded Plaintiff's privacy by inspecting Plaintiff's private records.

180.   Defendants' interference or invasion would be highly offensive to a reasonable person and Plaintiff felt seriously embarrassed and upset by the invasion and interference because Defendants accessed and reviewed Plaintiff's private files without authorization. Plaintiff's private records included his personal thoughts about others, his notes and discussions concerning contemplated litigation, and unpublished political commentary.

181.   Defendants' interference or invasion was a cause of Plaintiff's injuries and damages.

182.   Defendants' interference or invasion caused Plaintiff to be damaged, the nature, magnitude, and extent of which will be adduced in discovery and at trial, but in an amount of at least $50,000.

### COUNT V – PUBLIC DISCLOSURE OF PRIVATE FACTS

183.   Defendants publicly disclosed private information about Plaintiff, including his personal thoughts about others, his notes and discussions concerning contemplated litigation, and unpublished political commentary.

184.   Defendants' public disclosure of the private information about the Plaintiff would be highly offensive to a reasonable person. Defendants accessed and publicly disclosed Plaintiff's private files without authorization on their social media, podcasts, radio shows, television, and in news media.

185.   Defendants' disclosure of the information caused Plaintiff's injuries and damages.

186.   Defendants' disclosure of the information served no legitimate purpose other than to humiliate, terrorize, and harm Plaintiff. Plaintiff's lawful collection of materials in preparation for litigation, protection of safety, opposition research, and exercise of his First Amendment rights to make political commentary is not of legitimate concern to the public. Likewise, Plaintiff's personal views of private figures are of no legitimate concern to the public.

187.   Defendants' public disclosure of private information about Plaintiff caused Plaintiff to be damaged, the nature, magnitude, and extent of which will be adduced in discovery and at trial, but in the amount of at least $1,000,000.

## PUNITIVE DAMAGES

188.   Defendants acted with actual malice, because at the time the statements were made, said, or written, Defendants knew that the statements were false or acted in reckless disregard of whether the statements were true or false to justify an award of punitive damages against them.

189.   At all times relevant to this matter, Defendants acted in willful, wanton, and intentional disregard of Plaintiff's rights in his private records and Google Drive and with an evil mind to justify an award of punitive damages against them.

## REQUESTED RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.   For reputational damages in an amount to be proven at trial with interest accruing thereon at the legal rate from the date of judgment until paid;

B.   For compensatory damages for emotional harm in an amount to be proven at trial with interest accruing thereon at the legal rate from the date of judgment until paid;

C.   For compensatory damages for the deprivation of seclusion in an amount to be proven at trial with interest accruing thereon at the legal rate from the date of judgment until paid;

D.   For compensatory damages in an amount to be proven at trial;

E.   For economic damages suffered by Plaintiff in an amount to be proven at trial;

F.     For punitive damages of $10,000,000, with interest accruing on said sum at the legal rate from the date of judgment until paid;

G.     For Plaintiff's costs incurred herein, with interest accruing on said sums at the rate of 10% per annum from the date of judgment until paid;

H.     In the event of default, for the sum of $25,000,000 and for Plaintiff's attorney's fees incurred in securing the default judgment;

I.     For any post-judgment attorney's fees and costs, as may be awarded by the court, with interest on said sums at the rate of 10% per annum from the date of judgment until paid;

J.     For such other and further relief as to the Court appears just and appropriate in the circumstances.

DATED this 21st day of January, 2022.

**RYAN RAPP UNDERWOOD & PACHECO, PLC**


By: /s/ Christopher T. Rapp_____
     Christopher T. Rapp
     Andrew C. Pacheco
     *Attorneys for Plaintiff*

32